Christopher Sproul (Bar No. 126398)
Jodene Isaacs (Bar No. 226895)
Brian Orion (Bar No. 239460)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695
Email: csproul@enviroadvocates.com, jisaacs@enviroadvocates.com

Daniel Cooper (Bar No. 153576)
LAWYERS FOR CLEAN WATER, INC.
1004-A O'Reilly Avenue
San Francisco, California 94129
Telephone: (415) 440-6520
Facsimile: (415) 440-4155
Email: daniel@lawyersforcleanwater.com

Jason Flanders (Bar No. 238007)
SAN FRANCISCO BAYKEEPER
785 Market Street, Suite 850
San Francisco, California 94103
Telephone: (415) 856-0444
Facsimile: (415) 856-0443
Email: jason@baykeeper.org

Attorneys for Plaintiff
SAN FRANCISCO BAYKEEPER

(Additional counsel listed on following page)

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| BAYKEEPER, INC., d/b/a SAN FRANCISCO BAYKEEPER, a California non-profit corporation, | Civil Case No.:  10-00921 SBA |
| Plaintiff, | **CONSENT DECREE** |
| v. | |
| CITY OF SOUTH SAN FRANCISCO, a California municipal corporation, | |
| Defendant. | |

Steven T. Mattas (SBN: 154247)
smattas@meyersnave.com
Gregory J. Newmark (SBN: 190488)
gnewmark@meyersnave.com
Sabrina Wolfson (SBN: 248444)
swolfson@meyersnave.com
MEYERS, NAVE, RIBACK, SILVER & WILSON
575 Market Street, Suite 2600
San Francisco, California  94105
Telephone: (415) 421-3711
Facsimile: (415) 421-3767

Attorneys for Defendant,
City of South San Francisco

## CONSENT DECREE

The following Consent Decree is entered into by and between Plaintiff San Francisco Baykeeper ("Plaintiff" or "Baykeeper"), and Defendant City of South San Francisco ("Defendant" or "City") (collectively, "the Parties").

**WHEREAS**, Baykeeper is a non-profit public benefit corporation dedicated to, among other things, the protection and enhancement of the water quality of the San Francisco Bay;

**WHEREAS**, the City is a municipal corporation established by California state law;

**WHEREAS**, the City is regulated by the Federal Water Pollution Control Act, 33 U.S.C., §§ 1251 *et seq*. ("Clean Water Act or CWA"), California Water Code sections 13000 *et seq*. (the "Porter-Cologne Act"), and the General Waste Discharge Requirements for Sanitary Sewer Systems, State Water Resources Control Board Order No. 2006-0003-DWQ and Monitoring and Reporting Program No. 2006-0003-DWQ, as amended by Order No. WQ 2008-0002-EXEC ("SSO WDR");

**WHEREAS**, the City owns and/or operates a sewage collection system that serves South San Francisco;

**WHEREAS**, the City Collection System is intended to convey sewage to the South San Francisco Water Quality Control Plant ("the WQCP");

**WHEREAS**, on December 19, 2009, Baykeeper issued a sixty (60) day notice letter ("Notice Letter") to the City. The Notice Letter informed the City of alleged violations of the Clean Water Act and of Baykeeper's intention to file suit against the City. The Notice Letter was sent to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, and the Executive Director of the State Water Resources Control Board ("State Board"), as required by section 505(b)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter was also sent to the Executive Officer of the Regional Water Quality Control Board, San Francisco Bay Region, ("Regional Board");

**WHEREAS**, on March 4, 2010, Baykeeper filed its complaint (the "Complaint") against the City in the United States District Court for the Northern District of California ("District Court");

**WHEREAS**, the City denies Baykeeper's allegations that it has violated the Clean Water Act and denies it has liability to Baykeeper;

**WHEREAS**, the Parties, through their authorized representatives and without either adjudication of the Complaint's claims or admission by the City of any alleged violation or other wrongdoing, have chosen to resolve this action through settlement to avoid the costs and uncertainties of further litigation;

**WHEREAS**, although this Consent Decree requires the City to reduce City Collection System sanitary sewer overflows ("SSOs") to 5 SSOs per 100 miles of sewer pipe in 2015, and although further SSO reductions are not required by this Consent Decree, it is the mutual goal of the Parties to reduce City Collection System SSOs to 3 SSOs per 100 miles of sewer pipe per year or less (which Baykeeper contends is indicative of good collection system performance);

**WHEREAS,** all actions taken by the City pursuant to this Consent Decree shall be made in compliance with all applicable federal, state and local rules and regulations;

**WHEREAS**, for purposes of settlement, the Parties waive all objections that they may have to the District Court's decision to enter and retain jurisdiction over this Consent Decree.

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE PARTIES AND ADJUDGED, ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

### I. GENERAL OBJECTIVES

1.     The objectives of this Consent Decree are:

(a)     To ensure that the City uses, implements, and improves ways, means, and methods to prevent sanitary sewer overflows;

(b)     To ensure that the City uses, implements, and improves ways, means, and methods to prevent violations of, or to comply with, the Clean Water Act; and

(c)     To further the goals and objectives of the Clean Water Act.

2.     Accordingly, the Parties agree that, so long as the City is implementing the terms and conditions of this Consent Decree and is not in violation hereof, it is the intent of this Consent Decree that the City will be in full compliance with the requirements of the Clean Water Act related to collection system operations or management, such that the City contends no cause of action against the City would be available to other citizen suit plaintiffs thereunder.

/ / /

/ / /

---

## II.  DEFINITIONS

3.      Unless otherwise expressly defined herein, terms used in this Consent Decree that are defined in the Clean Water Act or in regulations, or in rules promulgated under the Clean Water Act, have the meaning assigned to them in the applicable statutes, regulations, or rules.  Whenever terms listed below are used in this Consent Decree, the following definitions apply:

(a)      "Consent Decree" means this Consent Decree, the District Court's Stipulated Order of Dismissal, and any exhibits or documents incorporated by reference to this Consent Decree.

(b)      "CCTV" means closed-circuit television.

(c)      "CIP" means the City's sewer system capital improvement program.

(d)      "City" means the City of South San Francisco.

(e)      "City Collection System" means the sewer pipes and lines, manholes or maintenance holes, pump stations, and all appurtenances thereto under ownership and responsibility of the City that are used to convey wastewater generated by residential, commercial, and industrial sources to the WQCP.  For purposes of this Consent Decree, the City Collection System does not include Private Laterals or other privately owned or operated infrastructure that may connect to the City Collection System.

(f)      "Day" means a calendar day.  In computing any period of time under this Consent Decree, where the last day of such period is a Saturday, Sunday, or Federal or State Holiday, the period runs until the close of business on the next day that is not a Saturday, Sunday, or Federal or State Holiday.

(g)      "Gravity Sewer" means pipes within the City Collection System that convey wastewater by gravity flow.

(h)      "Food Service Establishment" or "FSE" means any facility where food is served and intended for individual portion service, and includes the site at which individual portions are prepared or provided.

(i)      "FOG" means fats, oil, and grease.

(j)      "Force Main" means the pipelines within the City Collection System that convey wastewater under pressure from the discharge side of a pump or pneumatic ejector to a discharge point.

(k)     "Infiltration" means water other than wastewater that may enter the City Collection System through the pipes, joints, or cracks.

(l)     "Inflow" means water other than wastewater that may enter the City Collection System through unpermitted connections, drains, or manholes.

(m)     "I/I" means infiltration and inflow.

(n)     "Interest" means interest at the rate established by the Secretary of the Treasury pursuant to 28 U.S.C. § 1961.

(o)     "NPDES" means National Pollutant Discharge Elimination System.

(p)     "Pipeline Assessment Condition Protocol" or "PACP" means the condition assessment protocol established by the National Association of Sewer Service Companies.

(q)     "Private Lateral" means the private sanitary sewer lateral or line connecting a home or other structure to the City Collection System.

(r)     "Sanitary Sewer Overflow," "overflow", or "SSO" has the same meaning as those terms are defined in Section A.1. of the SSO WDR, or any amendment thereto, and which currently means: any overflow, spill, release, discharge or diversion of untreated or partially treated wastewater from [the City Collection System].  SSOs include:  (i) Overflows or releases of untreated or partially treated wastewater [from the City Collection System] that reach waters of the United States; (ii) Overflows or releases of untreated or partially treated wastewater [from the City Collection System] that do not reach waters of the United States; and (iii) Wastewater backups into buildings and on private property that are caused by blockages or flow conditions within the publicly owned portion of [the City Collection System].  For purposes of this definition, "waters of the United States" has the meaning as set forth in 40 C.F.R. § 122.2.

(s)     "Sewer Line Segment" means any section of publicly owned sewer line or pipe located between: (1) two manholes/maintenance holes; (2) a pump station and a manhole/maintenance hole; (3) a pump station or a manhole/maintenance hole and a headworks structure; or (4) a sewer line or pipe otherwise identifiable as a discrete section.

(t)     "SSMP" means the Sewer System Management Plan implemented by the City to monitor the condition, maintenance, and repair of the City Collection System.

(u)      "Year" shall mean calendar year, unless otherwise specified.

### III.  JURISDICTION AND VENUE

4.      This District Court has jurisdiction over the subject matter of the claims asserted by Baykeeper pursuant to section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

5.      Venue is proper in this judicial district pursuant to sections 309(b) and 505(c) of the Clean Water Act, 33 U.S.C. §§ 1319(b), 1365(c), and 28 U.S.C. §§ 1391(b) and (c).

6.      The Complaint filed herein states claims for which relief can be granted against the City pursuant to section 505 of the Clean Water Act, 33 U.S.C. § 1365.

7.      Baykeeper has standing to bring this action.

8.      The District Court shall retain jurisdiction over this matter during the term of this Consent Decree for purposes of interpreting, modifying or enforcing the terms of this Consent Decree.

### IV.  EFFECT OF CONSENT DECREE

9.      Notwithstanding the General Objectives of this Consent Decree, Baykeeper does not, by its consent to this Consent Decree, warrant or aver in any manner that the City's compliance with this Consent Decree will constitute or result in compliance with any federal or state law or regulation.  This Consent Decree is neither a permit nor a modification of existing permits under any federal, state, or local law and in no way relieves the City of its responsibilities to comply with all applicable federal, state and local laws and regulations.

10.      Nothing in this Consent Decree shall be construed as an admission by the City, and the City does not intend to imply any admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Consent Decree be construed as an admission by the City of any fact, finding, conclusion, issue of law, or violation of law.

11.      Compliance with this Consent Decree, including the payment of all mitigation and stipulated payments and Interest accrued thereon, and the completion of all Supplemental Environmental Projects required pursuant to this Consent Decree, resolves Baykeeper's civil claims for the violations alleged against the City in the Complaint, including all claims for civil penalties and attorneys' fees.

12.     Upon the Effective Date of this Consent Decree, Baykeeper hereby releases the City, and its officials, officers, employees and successors and assigns, from any and all claims related to SSOs that have or could have been claimed in the Complaint, known or unknown, up to and including the Effective Date of this Consent Decree.  Except for claims for the City's failure to comply with this Consent Decree, Baykeeper further releases the City, and its successors and assigns, from all claims pertaining to SSOs that may occur between the Effective Date and the termination of this Consent Decree.

## V.  APPLICABILITY

13.     The provisions of this Consent Decree apply to and bind the Parties, including any successors or assigns.  The Parties certify that their undersigned representatives are fully authorized to enter into this Consent Decree, to execute it on behalf of the Parties, and to legally bind the Parties to its terms.

14.      The Parties agree to be bound by this Consent Decree and not to contest its validity in any subsequent proceeding to implement or enforce its terms.  By entering into this Consent Decree, the City does not admit liability for any purpose as to any allegation or matter arising out of the Notice Letter and/or Complaint.

15.      No change in ownership or corporate or other legal status of the City or any transfer of the City's assets or liabilities shall in any way alter the responsibilities of the City, or any of its successors or assigns, under this Consent Decree.

16.     In any action to enforce this Consent Decree, the City shall not raise as a defense the failure by any of its agents, servants, contractors, employees, and successors or assigns to take actions necessary to comply with this Consent Decree.

## VI.  EFFECTIVE DATE AND TERMINATION DATE

17.     The term "Effective Date," shall mean the effective date of this Consent Decree, which shall be the date on which the District Court enters the final Consent Decree.

18.     This Consent Decree shall automatically and unconditionally terminate five (5) years and six (6) months from the Effective Date ("Termination Date") unless the City seeks early termination of this Consent Decree pursuant to this paragraph.  The City may seek early termination of this Consent

Decree if the City has no more than four SSOs per 100 miles of sewer from the City Collection System in a given calendar year followed by no more than three SSOs per 100 miles of sewer in the succeeding calendar year.[1]  The City shall initiate early termination by submitting a letter to Baykeeper demonstrating that it has satisfied the conditions of early termination set forth in this paragraph. Baykeeper shall respond to the City's letter within twenty (20) days indicating whether it agrees with the City's contentions or request more information to determine whether to agree with the City's contentions.  If Baykeeper agrees with the City's contentions, then the City shall prepare and file a joint motion for termination of this Consent Decree, which Baykeeper shall sign.  If Baykeeper disagrees with the City's contentions or requests additional information, then the matter shall be subject to the dispute resolution provisions of Part XXIV.

## VII.  SSO REDUCTION PERFORMANCE STANDARDS

19.     The City shall reduce its SSOs to comply with the following SSO Reduction Performance Standards:

(a)     Limitation on total SSOs per year:

| Calendar Year | Maximum Number of SSOs Per 100 Miles of Sewer Line/Year |
|:---:|:---:|
| 2011 | 10 |
| 2012 | 9 |
| 2013 | 7 |
| 2014 | 6 |
| 2015 | 5 |

---

[1]  To calculate compliance with the early termination provisions of Paragraph 18 and the SSO Reduction Performance Standards in Paragraph 19, the City shall use its current miles of publicly owned sewer line (including public laterals) to calculate the number of SSOs per 100 miles of sewer line and shall then round the number it calculates to the nearest whole number (i.e. if the number of SSOs per 100 miles calculates to be between 3.1 and 3.4, the value shall be rounded down to 3; if the number of SSOs per 100 miles calculates to be between 3.5 and 3.9, the value shall be rounded up to 4).  For purposes of calculating compliance with the early termination provisions of Paragraph 18, SSOs that satisfy the requirements set forth in Paragraphs 19(b) and 27 shall not be counted.

(b) For purposes of determining compliance with the SSO Reduction Performance Standards, SSOs caused by storm events exceeding a 10 year 6 hour storm shall not be counted.

(c) The City shall have no repeat spills due to pipe defects, grease, roots or debris within one year from the same sewer segment or manhole upon resolving the initial event.

20. For purposes of determining compliance with the SSO Reduction Performance Standards prior to the submission of the first Annual Summary Report required under Part XXI of this Consent Decree ("Annual Summary Report"), the Parties assume the City Collection System currently consists of 150 miles of gravity sewers, 60 miles of lateral sewers and 4.8 miles of force main sewers for a total of 215 miles.

21. Compliance with the SSO Reduction Performance Standards shall be determined using the miles of sewer lines as subsequently updated in the Annual Summary Report required under Part XXI of this Consent Decree. Failure to meet the SSO Reduction Performance Standards under Part VII shall be a violation of this Consent Decree and shall obligate the City to prepare and implement an SSO Reduction Action Plan as described in Part IX of this Consent Decree.

22. In order to reach the SSO Reduction Performance Standards, the City shall implement the programs described herein.

23. Compliance or non-compliance with the SSO Reduction Performance Standards shall be documented by the City in each Annual Summary Report required under Part XXI of this Consent Decree.

## VIII. SSMP REQUIREMENT

24. Within 180 days, the City shall develop and thereafter maintain a comprehensive SSMP, set forth as a single integrated document that fully complies with the SSO WDR and any administrative orders issued by the Regional Board. The SSMP shall set forth the measures, and an implementation schedule for the measures, that the City is and will in the future employ to attain a well-maintained and operated City Collection System. The SSMP shall further be designed to achieve compliance with the SSO Reduction Performance Standards, and meeting these standards shall be a criterion for determining the adequacy of the SSMP. The City shall update the SSMP as needed to remain in full compliance with the SSO WDR and any applicable Regional Board administrative orders. With the exception of SSMP

sections addressing the Capacity Assurance Plan, Force Main Condition Assessment and Pump Station Condition Assessment, Baykeeper's review and comment on the SSMP shall be limited to the issue of whether the SSMP is a single integrated document that contains all elements required by the SSO WDR.

## IX.  SSO REDUCTION ACTION PLAN

25.     If any Annual Summary Report provided by the City to Baykeeper pursuant to Part XXI of this Consent Decree documents SSOs in excess of this Consent Decree's then-applicable SSO Reduction Performance Standard, the City shall submit to Baykeeper by June 1st of that same year an SSO Reduction Action Plan that specifies the actions taken in the prior calendar year pursuant to this Consent Decree, and additional measures to be taken during the pending calendar year and thereafter, which are designed to achieve compliance with the SSO Reduction Performance Standards.  The SSO Reduction Action Plan shall include a proposed schedule for implementation of all actions proposed.

26.     The City shall include in the SSO Reduction Action Plan the measures necessary to achieve future compliance with the SSO Reduction Performance Standards.

27.     Notwithstanding the provisions of paragraph 25, the City shall have no obligation to prepare an SSO Reduction Action Plan in any given year if it submits to Baykeeper, by the date an SSO Reduction Action Plan would otherwise be due, a statement demonstrating through properly signed, contemporaneous records or other relevant evidence contemporaneous with the SSO that it did not comply with SSO Reduction Performance Standards because of one or more SSOs that meet all of the following conditions: (i) the SSOs were caused by severe natural conditions (such as hurricanes, tornados, widespread flooding, earthquakes, tsunamis, and other similar natural conditions), a human-caused catastrophe such as a catastrophic fire, contractor excavation damage to a sewer line or vandalism; and (ii) the City had no feasible alternatives, based on reasonable engineering judgment, that it could have implemented to avoid the SSO, such as the use of auxiliary treatment facilities, retention of untreated wastewater, reduction of inflow and infiltration, use of adequate backup equipment, an increase in the capacity of the system, implementation of measures to educate contractors concerning avoiding damage to sewer lines or other sewer system assets, or reasonable anti-vandalism measures to prevent foreseeable vandalism risks.

## X.  IMPLEMENTATION OF FATS, OILS AND GREASE PROGRAM

28.     The City shall continue to implement its residential outreach program to educate the public on proper FOG disposal in order to reduce the discharge of FOG to the City Collection System from residential sources.  Within ninety (90) days of the Effective Date of this Consent Decree, the City shall submit to Baykeeper a Residential FOG Outreach Program Plan describing an expanded residential outreach program to reduce FOG from residential sources.  At a minimum, the City's Residential Outreach Program shall consist of mailing or hand delivery of leaflets to residential customers, posting of educational materials on the City's website, distribution of grease receptacles, and providing educational materials to public schools aimed at reducing the discharge of residential grease. Within ninety (90) days of the Effective Date, the City shall institute a commercial outreach program to educate commercial establishments with the potential to discharge FOG to the sanitary sewer system on the use of Best Management Practices ("BMPs"), and the proper maintenance of grease recovery devices to reduce FOG from commercial sources consistent with the device manufacturer's requirements.

29.     The City shall continue to conduct its commercial FOG source control, inspection, education, and preventive maintenance program. The City shall require and undertake education outreach and enforcement measures to ensure that all FSEs do the following:

(a)      Implement all FOG BMPs currently recommended by the City, as applicable to each facility (the City shall further find that any inspected FSE that fails to do so shall be deemed to have failed the City's inspection);

(b)      Receive and post, in appropriate locations for their employees to see, the City's BMP procedures that are applicable to that business that show how to properly handle FOG;

(c)      Maintain up to date maintenance and cleaning logs for their grease interceptors (if applicable) and have them readily available for review by the City's personnel during inspection (the City shall further find that any inspected FSE that fails to do so shall be deemed to have failed the City's inspection);

(d)      Apply for a pre-treatment discharge permit in accordance with the City's Water Quality Control Ordinance.

/ / /

30. The City shall continue its inspection program and shall inspect all FSEs no less than once a year. FSEs found in violation of the City's FOG ordinance shall be re-inspected within thirty (30) days. Repeat violations shall be met with increased enforcement actions as deemed necessary by the City to enforce compliance.

31. The City shall send a warning letter to any FSE found to be the cause of a FOG-related SSO. The warning letter shall describe the cause of the SSO that has been attributed to the FSE, outline pertinent parts of the City's FOG Ordinance and identify remediation methods and corrective actions to comply, such as improved BMPs (including more effective removal of FOG from cookware via paper towels, scrapers, or other devices, before cleaning cookware in dishwashers or sinks) or installation and/or improved maintenance of City-approved grease removal devices. Such warning letter will require the recipient to acknowledge receipt within thirty (30) days. However, the City has the discretion to issue a Notice of Violation, conduct a Show Cause Hearing on the violation(s) and issue fines, citations(s) or refer a case to its City Attorney in lieu of a warning letter when circumstances indicate more action is appropriate.

**XI. ROUTINE SEWER CLEANING AND HOT SPOTS CLEANING PROGRAMS**

32. The City shall continue to clean all of its gravity sanitary Sewer Line Segments fifteen (15) inches in diameter or smaller in the City Collection System in accordance with a schedule that is appropriate for the prevention of SSOs, but in any event the City shall clean the entire City Collection System at least once every five (5) years.

33. The City shall include any Sewer Line Segment that has a blockage caused by roots, debris, grease or pipe condition into its Hot Spot Cleaning Program. Within one hundred and twenty (120) days from the Effective Date of this Consent Decree, the City shall develop a Hot Spot Cleaning Work Plan ("HSCWP"). The HSCWP shall include a listing of all lines requiring Hot Spot Cleaning and the cleaning frequency identified for each identified line. The HSCWP shall include the rationale relied upon to select the main sewer segments included in the HSCWP and to determine cleaning frequencies. Cleaning frequencies for the Hot Spot Cleaning Program shall include: three (3) month, six (6) month, and twelve (12) month cleaning cycles as needed. The HSCWP shall incorporate the methodology set forth below in Figure 1 ("Preventive Maintenance Scheduling Flow Chart") below. If

any Sewer Line Segment included in the HSCWP is subsequently repaired or replaced and the need for the placement of the segment in the HSCWP is eliminated, the Sewer Line Segment may be removed from HSCWP and shall be indicated in the Annual Summary Report required by Part XXI of this Consent Decree.



34.     The Hot Spot Cleaning Program results shall be maintained in a database by the City.

35.     The City shall collect all observations made by its sewer cleaning crews regarding the extent and nature of materials removed during the cleaning process.  The observations shall be recorded in the City's database.  The City shall maintain or change the frequency of its Hot Spot Cleaning

Program for a Sewer Line Segment based on the Sewer Cleaning Results Matrix below in accordance with the section labeled "Action."

**Sewer Cleaning Results Matrix**

| | Clear | Light | Moderate | Heavy |
|---|---|---|---|---|
| **Debris** | No observable debris | Minor amount of debris <br> 1 pass | Moderate amounts of debris <br> 2-3 passes | Significant amounts of debris <br> More than 4 passes <br> Operator concern for future stoppage |
| **Grease** | No observable grease | Minor amounts of grease <br> 1 pass | Small "chunks" <br> No "logs" <br> 2-3 passes | Big "chunks" or "logs" <br> More than 4 passes <br> Operator concern for future stoppage |
| **Roots** | No observable roots | Minor amounts of roots <br> 1 pass | Thin stringy roots <br> No "clumps" <br> 2-3 passes | Thick roots <br> Large "clumps" <br> More than 4 passes <br> Operator concern for future stoppage |
| **Debris:** Structural pipe fragments soil, rock, etc. | No observable materials | Specify material (if possible) <br> Minor amounts of material | Specify material <br> Moderate amounts of material per line segment | Specify material <br> Significant amounts of material per line segment <br> Operator concern for future stoppage |
| **Action** | Decrease frequency to next lower frequency after 3 consecutive results (e.g. 6 months to 12 months) | Continue current maintenance frequency | Increase maintenance frequency as necessary (e.g. 6 months to 3 months, or more frequently if necessary) | Increase maintenance frequency as necessary (e.g. 6 months to 3 months or more frequently if necessary) |

36.     Changes in cleaning frequency based upon cleaning results shall be as follows:

(a)     No reduction in cleaning frequency shall be made in a Sewer Line Segment with a previous history of SSOs without the approval of the Public Works Supervisor.

/ / /

(b)     Three (3) consecutive results of "clear" will cause the cleaning frequency to be reduced to the next lower cleaning frequency;

(c)     Results of "moderate" or "heavy" will cause the cleaning frequency to be increased to the next highest frequency, if any, if the Sewer Line Segment is already part of the Hot Spot Cleaning Program.

37.     Main Sewer Line Segments shall be added to the Hot Spot Cleaning Program based on the findings from any CCTV Condition Assessment using the City's system of Defect Codes and Ratings.  Any Sewer Line Segments with a condition assessment rating of "Medium" or "Heavy" for roots, grease, or debris will be added to the Hot Spot Cleaning Program.  A Sewer Line Segment with a condition assessment rating of "Medium" for roots, grease or debris will be added at a six (6) months cleaning frequency.  A Sewer Line Segment with a condition assessment rating of "Heavy" for roots, grease, or debris will be added at a three (3) months cleaning frequency.

38.     The City shall institute and maintain a quality assurance/quality control program ("QA/QC Program") adequate to ensure proper and complete cleaning of sewers.  The QA/QC Program shall consist of spot-checking the cleaning quality in a minimum of two (2) Sewer Line Segments of the cleaned sewers on a monthly basis using CCTV to ensure adequate cleaning.  If the cleaning is found to be inadequate, the City shall re-clean the Sewer Line Segment within thirty (30) days.  If one (1) of the spot-checked Sewer Line Segments requires re-cleaning in any given month, the City shall increase spot-checking of the system to a minimum of five Sewer Line Segments of sewer lines cleaned.  Where spot-checking of the system has increased to a minimum of five Sewer Line Segments pursuant to this section, the City shall not reduce such spot checking until three (3) consecutive months showing none of the Sewer Line Segments inspected require re-cleaning.  If a required inspection frequency increase is prompted by cleaning problems attributed to a single crew, the increased inspection schedule will only apply to that crew.

39.     If routine sewer cleaning or hot spot cleaning of a Sewer Line Segment or area cannot be properly accomplished due to sewer line condition or access limitations, the condition of the segment shall be considered failing, and placed in the City's Spot Repair Program (see paragraph 48, below). The City shall repair that Sewer Line Segment or area within one hundred twenty (120) days of

discovery of the sewer defect, or in the event a permit or permission from a third party is required to repair the Sewer Line Segment, within one hundred twenty (120) days of obtaining the necessary permits or permission. The Sewer Line Segment shall be repaired in a manner sufficient to allow that segment or area to be effectively cleaned.

## XII. INFORMATION MANAGEMENT

40.     Commencing within ninety (90) days of the Effective Date, the City shall implement and maintain a continuously updated computerized data and information system, linked to GIS, to record and track pertinent asset management, operations, and maintenance. This information system shall be used in conjunction with the City's GIS database to track and make readily available to relevant City employees and contractors information concerning SSO history, sewer line cleaning, sewer line and manhole spot repairs, sewer line CCTV inspections, gravity and force main sewer line condition assessment, sewer line rehabilitation and replacement projects, pump station condition assessments, pump station repair projects and other information necessary to plan system operation and maintenance and capital improvement.

41.     The City shall update its GIS database by June 30, 2012 to include all available City Collection System attributes that will facilitate City Collection System operation and maintenance. The City shall regularly revise and update the GIS database as the City acquires new information. The City shall include the following information in its GIS database to the extent available: (1) for sewer lines-- sewer line diameters, lengths, sewer line slope, service area covered by line segment and corresponding land use, location of potentially conflicting utilities, whether a sewer line is located in a right-of-way or an easement, and construction material, year of construction, inspection history, cleaning history, repair history, and any known structural defects, and (2) for manholes--locations, depth, lid size, manhole diameter, rim elevation, and invert elevation, repair history, and any known structural defects, (3) for pump stations--year of construction, status of mechanical and electrical components, spare parts inventory, availability of backup power and pumping capabilities, wet well storage capacity, average and peak flow, pumping capacity, inspection history, maintenance and repair history, and any known structural defects.

/ / /

### XIII.  PUMP STATION CONDITION ASSESSMENT

42.     The City's SSMP shall specify methods and a time schedule for a repeating cycle of assessing the condition of the City's pump stations.

### XIV.  FORCE MAIN CONDITION ASSESSMENT

43.     The City's SSMP shall specify methods and a time schedule for a repeating cycle of assessing the condition of the City's force mains.

### XV.  SEWER AND MANHOLE CONDITION ASSESSMENT

44.     The City shall implement a Sewer Line and Manhole Condition Assessment Program as specified in this Part.  Within one hundred (100) days of the Effective Date of this Consent Decree, the City shall provide to Baykeeper a plan for CCTV inspections of gravity sewer main lines and visual inspection of manholes ("Sewer Line and Manhole Inspection Plan").  The plan shall include the following information: the type of equipment the City will purchase to implement its Sewer Line and Manhole Condition Assessment Program, the date by which the City will purchase such equipment, and a schedule for CCTV inspections of gravity sewer main lines and visual inspection of manholes.  To the extent practicable, the City shall first inspect areas with known SSO, structural, or blockage problems and then inspect gravity sewers ten (10) years old or older.

45.     Within five (5) years of the Effective Date of this Consent Decree, the City shall complete CCTV inspection and condition assessment of all gravity main Sewer Line Segments in the City Collection System that are fifteen (15) inches and smaller in diameter and are greater than ten (10) years old and shall concurrently visually inspect all manholes in these Sewer Line Segments in accordance with the schedule set forth in the Sewer Line and Manhole Inspection Plan.  The City shall inspect and assess no less than 15% of its gravity main Sewer Line Segments in each of the first two (2) years of this Consent Decree, 20% in each of the third and fourth years of this Consent Decree, and the remaining 30% in the fifth year.  However, if the City CCTVs more than the minimum percentage required for any given year, the amount exceeding the minimum percentage required may be credited to a subsequent year.  The City shall concurrently visually inspect all manholes in these sewer lines.

46.     Any sewer line where inspection is not possible because the passage of the CCTV camera was blocked by the condition of the pipe shall result in the Sewer Line Segment being defined as having

failed the inspection. Within three (3) months of failed attempt to inspect that line, or in the event a permit or permission from a third party is required to repair the Sewer Line Segment, within three (3) months of obtaining the necessary permits or permission, the City shall repair that sewer line in such fashion as to allow inspection and shall re-inspect that line before the end of the five (5) year inspection cycle.

47. The City shall employ a system of defect codes and ratings ("System of Defect Codes and Ratings") that is consistent with the PACP to assess the results of its CCTV inspections of sewer main lines. The City shall produce and maintain a sewer line inspection and grading database consisting of the City's CCTV inspection tapes and logs and the grading of its sewer lines, employing the System of Defect Codes and Ratings, based on this inspection. The City shall further adopt and utilize an objective grading system for its concurrent assessment of sewer manholes. The City shall use the results of the CCTV inspection and condition assessment to identify and prioritize City Collection System deficiencies requiring repair, rehabilitation or replacement and shall incorporate identified sewer repair, rehabilitation and replacement projects into the City's CIP based on the ranking and resulting prioritization.

48. The City shall continue to implement its Spot Repair Program, which is the City's program for addressing localized sewer line or manhole defects in need of repair. The City shall schedule and perform spot repairs based on the results of its condition assessment provided for in paragraph 45, field observations made during sewer line cleaning, and other relevant information that indicates the need for spot repairs.

## XVI. CAPACITY ASSURANCE

49. The City's SSMP shall specify methods and a time schedule for a repeating cycle of assessment of the capacity of the City Collection System sufficient to ensure that the City does not in the future experience a return of capacity problems.

## XVII. CAPITAL IMPROVEMENT PROJECTS

50. The City shall repair, rehabilitate or replace any sewer lines or portions of sewer lines discovered during the term of this Consent Decree to be in imminent risk of failure, as expeditiously as

/ / /

---

[Proposed] Consent Decree      17      Case No. C-09-05676 EMC

possible.  Other than as provided in this paragraph or paragraph 48, the City is not required by this Consent Decree to perform sewer line repair, rehabilitation and replacement.

51.     By May 1, 2014, the City shall prepare a 15-year CIP ("Long Range CIP") that specifies rehabilitation or replacement projects necessary to address City Collection System deficiencies identified as part of the City's condition assessment program.  The Long Range CIP shall include or be accompanied by the City's financial analysis of the costs of CIP projects compared to the revenues available for these projects and the City's conclusions concerning how the City's finances are adequate to ensure timely completion of the projects.

## XVIII.  PRIVATE LATERAL PROGRAM

52.     Within 180 days of the Effective Date, the City Manager shall propose and recommend to the South San Francisco City Council, with notice to Baykeeper, the adoption of an ordinance that requires property owners to inspect Private Laterals upon sale of a property and to replace defective Private Laterals made of Orangeburg pipe as a requirement of transfer of the property.  The City Council shall take final action on the City Manager's recommendation within ninety days.  If the City Council does not enact the Ordinance within such ninety-day period, the City shall propose to Baykeeper an alternative means for securing the replacement of such defective Private Laterals that will secure a rate of replacement of such defective Private Laterals equivalent to the rate of replacement that would have been secured by implementation of the Ordinance.

## XIX.  CONSENT DECREE EXPENDITURES

53.     Notwithstanding any provision to the contrary set forth herein, subject to Paragraph 54 below, for each calendar year that this Consent Decree is in effect, the City shall not be required to spend more than the sum of its current $3.8 million annual expenditure on the City Collection System and the incremental increases set forth in the table below.

/ / /

/ / /

| Consent Decree Year | Incremental Increase |
|---|---|
| 2011 | $380,000 |
| 2012 | $406,600 |
| 2013 | $433,200 |
| 2014 | $459,800 |
| 2015 | $486,400 |

54.     If additional expenditures are necessary to rehabilitate, replace or repair Sewer Line Segments determined to be in imminent risk of failure or collapse, this Consent Decree shall not require the City's total annual expenditures on its City Collection System and wastewater treatment operations and infrastructure to exceed an amount equal to the amount of expenditures the City could afford if its residential sewer service rates were equal to the then-existing mean sewer rates for the County of San Mateo.[2]

55.     In budgeting for and implementing City Collection System capital projects and operation and maintenance activities, the City shall place the highest priority on any actions needed to address Sewer Line Segments judged to be in imminent risk of failure or collapse.  If the City deems it necessary to reduce expenditures below what it might otherwise spend to meet the substantive requirements of this Consent Decree and below the expenditure caps set forth in paragraphs 53 and 54, the City shall reduce its expenditures on other components of its City Collection System in order to address Sewer Line Segments judged to be in imminent risk of failure or collapse (i.e., the City's highest City Collection

[2] The then-existing mean sewer rates referenced in this paragraph shall be calculated using the then-existing residential sewer rates for the following jurisdictions: Burlingame Hills Sanitation District, City of Belmont, City of Brisbane, City of Burlingame, City of Daly City, El Granada Sanitary District, City of East Palo Alto, City of Foster City, City of Half Moon Bay, City of Hillsborough, City of Menlo Park, City of Millbrae, Montara Sanitary District, City of Pacifica, City of Redwood City, City of San Bruno, City of San Carlos, City of San Mateo, and City of South San Francisco.   Where the sewer rate for a jurisdiction is not a flat fee, the sewer rate shall be calculated based on the homeowners' average annual domestic water consumption.

System spending priority when faced with financial constraints shall be funding remedial work needed to address Sewer Line Segments judged to be in imminent risk of failure or collapse).

## XX.  BAYKEEPER REVIEW OF CONSENT DECREE DELIVERABLES

56.     Baykeeper shall have the right to review and comment upon the following submittals required of the City pursuant to this Consent Decree: any SSO Reduction Action Plan pursuant to Part IX, the revised SSMP pursuant to Part VIII, the Residential FOG Outreach Program Plan pursuant to Part X,  the HSCWP pursuant to Part XI, the Sewer Line and Manhole Inspection Plan pursuant to Part XV, and the Long Range CIP pursuant to Part XVII ("the Consent Decree Deliverables" or "the Deliverables").  Baykeeper shall provide the City, in writing, with any comments on the Consent Decree Deliverables within thirty (30) days of Baykeeper's receipt of these Deliverables.  The City shall consider in good faith each of Baykeeper's comments on each Consent Decree Deliverable.  If the City rejects any of Baykeeper's comments on a Consent Decree Deliverable, within twenty days of a written request from Baykeeper for either a written explanation or a meeting to confer about the City's position, the City shall, depending on Baykeeper's request, provide a written explanation or explain its position in a meeting with Baykeeper as to why Baykeeper's comments are being rejected.

## XXI.  ANNUAL SUMMARY REPORT

57.     Beginning on March 1, 2012, and on each March 1 thereafter that this Consent Decree is in effect, the City shall submit an Annual Summary Report to Baykeeper.  The Annual Summary Report shall:

(a)     Include all information concerning the City's SSOs during the prior calendar year that the City is required to report to the State Water Resources Control Board pursuant to the SSO WDR;

(b)     Indicate whether the City met the SSO Reduction Performance Goals and explain the basis for the City's conclusions in this respect;

(c)     Describe in detail the City's implementation of any current SSO Reduction Action Plan, including the City's efforts to secure the necessary funding to implement such Plan;

(d)     Report the number and location of SSOs caused by FOG from residential versus commercial sources. The Report shall further describe the City's efforts to implement its FOG Program

(including both the dates and specific nature of efforts to address residential and commercial sources of FOG, including implementing measures designed to educate about proper FOG disposal and enforcement of FOG ordinance requirements) pursuant to Part X;

(e)      Describe the City's implementation of its Routine Sewer Cleaning Program and Hot Spot Cleaning Program pursuant to Part XI.  Specifically, for the Routine Sewer Cleaning Program, the report shall state the total miles cleaned, total unique miles cleaned, and the percentages of the City Collection System cleaned for each category.  If any problems were encountered with cleaning personnel or equipment related to this Consent Decree, or with line defects that impaired cleaning, the report shall describe the problems and how they were addressed.  If the QA/QC Program described in paragraph 38 does not reveal any problems, the report shall so state.  For the Hot Spot Cleaning Program, the report shall include a list of all Sewer Line Segments on the Hot Spot Cleaning List at the beginning of the year, and a similar list for the end of the year, how many of miles of sewer line were removed from the Hot Spot Cleaning list and how many miles were added to the Hot Spot Cleaning List during the year;

(f)      Describe the City's Pump Station Condition Assessment activities for the year pursuant to Part XIII, Force Main Condition Assessment activities for the year pursuant to Part XIV and Capacity Assurance activities for the year, if any, pursuant to Part XVI.;

(g)      Describe the City's implementation of the Sewer Line and Manhole Condition Assessment Program pursuant to Part XV and the CIP requirements of Part XVII, including: (1) specification of how many miles of sewer line the City subjected to CCTV inspection, (2) the City's grading of its gravity sewer lines (how many miles of gravity sewer line the City determined fell within each separate grade category in the City's grading system and an identification of the Sewer Line Segments receiving PACP codes of 3, 4 and 5, as well as the number of Sewer Line Segments categorized as "moderate" and "heavy" for FOG, grease and debris), (3) the City's adoption of an updated list of prioritized sewer line repair projects based on the City's sewer line condition assessment, and (4) the number and type of Spot Repairs made in the last year, and the number and type planned in the future and (5) the number and type of repairs made to address imminent failure risks and the number and type planned in the future;

(h)     Describe the City's implementation of its Private Lateral Program pursuant to Part XVIII and the Lateral Replacement Program Supplemental Environmental Project (Private Lateral SEP) pursuant to Part XXII.  Specifically, in the year or years in which a Private Lateral Ordinance was considered and/or adopted, the report shall include a copy of the ordinance.  For subsequent years, the report shall include any amendments or modifications to the Ordinance, number of laterals inspected, number of laterals found to be defective, and number of laterals replaced pursuant to the programs.  For the Private Lateral SEP, the number of loans or grants made for lateral replacement during the year, the total value of loans and grants provided during the year, the mean and median loan or grant values for the year, the median percentage of total lateral replacement cost funded by the Private Lateral SEP, the number of applications to participate in the program submitted and processed during the year, and a narrative discussion of any change in the approach toward the size of loan or grant available;

(i)     Describe the City's annual expenditures on City Collection System operation, maintenance and capital projects, the City's revenues for operation of the City Collection System and WQCP from sewer fees and any bonds, and the City's adjustments (if any) to its sewer rates.

(j)     Describe the City's development of and implementation of its Information Management obligations pursuant to Part XII;

If the City's annual report to the Regional Board meets all the requirements of this Part XXI, the City may comply with this Part by providing Baykeeper with a copy of the annual reports.

### XXII.  ENVIRONMENTAL MITIGATION PROJECT AND FEES AND COSTS

58.     To mitigate perceived environmental harms resulting from the allegations in the Complaint, the City shall pay to the Rose Foundation for Communities and the Environment the total sum of One Hundred Fifty Thousand Dollars ($150,000) ("the Mitigation Payment") to be used to fund environmental project activities that will benefit the San Francisco Bay or its tributaries.  None of the mitigation payments paid to the Rose Foundation pursuant to this Part XXII shall be used to fund Baykeeper.  Payment shall be made within thirty (30) days of the Effective Date of this Consent Decree, to:

/ / /

/ / /

The Rose Foundation for Communities and the Environment
6008 College Avenue, Suite 10
Oakland, California 94618
Attention: Tim Little

The City shall also implement the Private Lateral Program Supplemental Environmental Project(s) ("SEP") described in Exhibit A in accordance with the timelines set forth therein.  The Parties agree that SEP is intended to secure significant environmental benefits to the watersheds and ocean waters in and adjacent to South San Francisco.  The City shall fund the SEP in the amount of Three Hundred Thousand Dollars ($300,000).  The City shall spend this sum on Private Lateral improvements by no later than 30 days before the termination of this Consent Decree.  If the City has not spent this sum on Private Lateral improvements by that date, the City shall convey the difference between $300,000 and the sum it has spent on such improvements to the Rose Foundation for Communities and the Environment to the address listed above no later than 20 days before the termination of this Consent Decree.  The City shall simultaneously provide Baykeeper notice, in accord with Part XXVII, that it has made this payment to the Rose Foundation.

59.     To help defray Baykeeper's attorney's, consultant, and expert fees and costs, and any other costs incurred as a result of investigating, filing this action, and negotiating a settlement, the City shall pay Baykeeper the sum of One Hundred Eighty-Six Thousand Dollars ($186,000) which shall include all attorneys' fees and costs for all services performed by and on behalf of Baykeeper by its attorneys and consultants up to and through the Effective Date of this Consent Decree.  The payment shall be made within twenty-one (21) days of the Effective Date of this Consent Decree.  The payment shall be made in the form of a check payable to "*Environmental Advocates Client Trust Account*," addressed to:  5135 Anza Street, San Francisco, CA 94121, sent via overnight delivery, and shall constitute full payment for all costs of litigation incurred by Baykeeper that have or could have been claimed in connection with or arising out of Baykeeper's lawsuit, up to and including the Effective Date.

60.     The City agrees to compensate Baykeeper for time to be spent by legal staff or technical consultants reviewing compliance reports and any other documents, or participating in any meet and confer process or Informal Dispute Resolution under this Consent Decree.  To this end, the City shall pay Sixty Thousand Dollars ($60,000) within twenty-one (21) days of the Effective Date of this Consent

Decree.  Payment shall be made payable to "San Francisco Baykeeper," addressed to Jason Flanders, SAN FRANCISCO BAYKEEPER, INC., 785 Market Street, Suite 850, San Francisco, California 94103-2023, sent via overnight delivery.

61.     In the event of late payment of any of the sums due referred to in this Part, the City shall pay Interest to Baykeeper, which shall accrue daily from the thirtieth (30th) day past the date the sum was due until the date the City tenders payment.

## XXIII.  STIPULATED PAYMENTS

62.     Subject to Paragraph 63, if the City fails to submit to Baykeeper a Consent Decree Deliverable or Annual Report by the deadlines set forth herein, it shall be subject to the following stipulated payments:

| Period of Noncompliance | Payment Per Violation Per Day |
|---|---|
| Days 1-30 | $100 |
| Days 31-60 | $500 |
| Days over 60 | $1,000 |

63.     In the event of a late Consent Decree Deliverable or Annual Report, the City shall send Baykeeper the Consent Decree Deliverable or Annual Report.  Baykeeper shall notify the City of receipt of the late Consent Decree Deliverable or Annual Report and may include an invoice for the amount of any stipulated payments due and payable.  The City shall contact Baykeeper within five (5) working days if the City disagrees with Baykeeper's stipulated payment calculation and may meet and confer with Baykeeper or seek Dispute Resolution pursuant to Part XXIV of this Consent Decree.  The City shall pay any stipulated payments assessed pursuant to this Consent Decree within thirty (30) days after receipt of Baykeeper's invoice itemizing the stipulated payment liability, or thirty (30) days after resolution of a dispute if Dispute Resolution has been invoked pursuant to Part XXIV of this Consent Decree.  Nothing in this Consent Decree shall prevent Baykeeper from waiving any stipulated payments, which might be due under this Section, based on the outcome of any Dispute Resolution proceeding or the City's good faith efforts.

/ / /

/ / /

64.     If the City fails to pay any of the stipulated payments required by this Consent Decree within thirty (30) days of the date such payments are due, Interest shall accrue from the date payment was due until the City makes the required payment.

65.     All payments of stipulated payments described in this Consent Decree shall be paid by the City to the "*Rose Foundation for Communities and the Environment*" to be used solely to fund activities which benefit San Francisco Bay or its tributaries.  The City shall send payments via overnight mail to: Rose Foundation for Communities and the Environment, 6008 College Avenue, Oakland, CA 94618, Attn: Tim Little.  The City shall send notice to Baykeeper in accord with Part XXVII that it has sent any such payments to the Rose Foundation. None of the stipulated payments paid to the Rose Foundation pursuant to this Part XXIII shall be used to fund Baykeeper.

## XXIV.  DISPUTE RESOLUTION

66.     This Court shall retain jurisdiction over this matter for the purposes of adjudicating all disputes among the Parties that may arise under the provisions of this Consent Decree.  The District Court shall have the power to enforce this Consent Decree with all available legal and equitable remedies, including contempt.

67.     The Dispute Resolution procedures set forth in this Part shall be the exclusive mechanism for resolving disputes between the Parties with regard to any aspect of this Consent Decree.

68.     Either Party to this Consent Decree shall invoke the dispute resolution procedures of this Part by notifying the other Party in writing of the matter(s) in dispute and of the Party's proposal to resolve the dispute under this Part.  The Parties shall then meet and confer in a good faith attempt to resolve the dispute informally ("Informal Dispute Resolution") within thirty (30) calendar days from the date of the notice.

69.     If the Parties cannot resolve a dispute within thirty (30) calendar days from the date of the notice as specified in Paragraph 68 above, the Party invoking Informal Dispute Resolution may invoke formal dispute resolution ("Formal Dispute Resolution") by filing a motion before the District Court.

70.     The prevailing Party in any Formal Dispute Resolution proceeding shall be entitled to attorneys' fees and costs in accord with the standard established by 33 U.S.C. section 1365(d).

/ / /

## XXV.  LODGING OF CONSENT DECREE

71.     Baykeeper shall submit a copy of this Consent Decree to DOJ and EPA within three (3) days of its execution for agency review consistent with 40 C.F.R. § 135.5.  The agency review period expires forty-five (45) days after receipt by both agencies, as evidenced by the certified return receipts, copies of which shall be provided by Baykeeper to the City upon request.  If the EPA or DOJ request or suggest revisions to this Consent Decree or object to entry of this Consent Decree in the form presented, the Parties shall attempt in good faith to agree to revisions of this Consent Decree in accord with the requested or suggested revisions provided by EPA or DOJ and/or otherwise accommodate EPA or DOJ's objections.  If the District Court objects to entry of this Consent Decree in the form presented, the Parties will attempt in good faith to agree to revisions of this Consent Decree necessary so that it is acceptable to the District Court.

72.     Baykeeper shall lodge this [proposed] Consent Decree with the District Court within three (3) days of the Parties' execution of this Consent Decree.  Baykeeper will thereafter promptly request the District Court to enter this Consent Decree after the DOJ and EPA comment period specified by 40 C.F.R. § 135.5 (and after the completion of the meet and confer process referred to in the preceding paragraph, if any).

## XXVI.  MUTUAL RELEASE OF LIABILITY AND FORCE MAJEURE

73.     In consideration of the above, upon the Effective Date of this Consent Decree, the Parties hereby fully release, except as expressly provided below, each other and their respective successors, assigns, officers, agents, employees, and all persons, firms, and corporations having an interest in them, from any and all claims arising from SSOs that have or could have been claimed in the Complaint, known or unknown, up to and including the Effective Date of this Consent Decree.  Except for claims for the City's failure to comply with this Consent Decree, Baykeeper further releases the City, and its successors and assigns, from all claims pertaining to alleged SSOs that may occur between the Effective Date and the termination of this Consent Decree.

74.     Nothing in this Consent Decree limits or otherwise affects Baykeeper's right to address or take any position that it deems necessary or appropriate in any formal or informal proceeding before the Regional Board, EPA, or any other judicial or administrative body on any other matter relating to the

City.

75.     Neither this Consent Decree nor any payment pursuant to this Consent Decree shall constitute or be construed as a finding, adjudication, or acknowledgement of any fact, law, or liability, nor shall it be construed as an admission of violation of any law, rule, or regulation.  The City maintains and reserves all defenses it may have to any alleged violations that may be raised in the future.

76.     The City's obligation to comply with one or more of the provisions of this Consent Decree shall be deferred to the extent and for the duration that the delay in compliance is caused by impossibility due to an event or circumstances beyond the reasonable control of the City and that could not have been reasonably foreseen and prevented by the exercise of due diligence by the City.

77.     Any delays due to the City's failure to make timely and bona fide applications, the City's failure to exercise diligent efforts to comply with the terms in this Consent Decree, or normal inclement weather shall not, in any event, be considered to be circumstances beyond the City's control.  Financial inability shall not, in any event, be considered to be circumstances beyond the City's control.

78.     If the City claims impossibility, it shall notify Baykeeper in writing within thirty (30) days of the date that the City first knew of the event or circumstance that caused or would cause a violation of this Consent Decree, or the date the City should have known of the event or circumstance by the exercise of due diligence.  The notice shall describe the reason for the nonperformance and specifically refer to this Part of this Consent Decree.  It shall describe the anticipated length of time the delay may persist, the cause or causes of the delay, the measures taken or to be taken by the City to prevent or minimize the delay, the schedule by which the measures will be implemented, and the anticipated date of compliance.  The City shall adopt all reasonable measures to avoid and minimize such delays.

If Baykeeper disagrees with the City's notice, or in the event that the Parties cannot timely agree on the terms of new performance deadlines or requirements, either Party shall have the right to invoke the Dispute Resolution procedures pursuant to Part XXIV of this Consent Decree.  In such proceeding, the City shall bear the burden of proving that any delay in performance of any requirement of this Consent Decree was caused or will be caused by force majeure and the extent of any delay attributable to such circumstances.

## XXVII.  NOTICES AND SUBMISSIONS

79.     Any notifications, submissions, or communications to Baykeeper or to the City pursuant to this Consent Decree shall be, to the extent feasible, sent via electronic mail transmission to the e-mail addresses listed below (electronic return receipt requested) or, if electronic transmission is not feasible, via U.S. Mail or hand delivery to the following addresses.  Any change in the individuals or addresses designated by any party must be made in writing to all Parties, but the parties stipulate and agree that the District Court need not amend this Consent Decree to effectuate a change in the notice recipients.

If to BAYKEEPER:

Christopher Sproul
Jodene Isaacs
Brian Orion
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695
Email: csproul@enviroadvocates.com, jiaacs@enviroadvocates.com, borion@enviroadvocates.com


Daniel Cooper
LAWYERS FOR CLEAN WATER, INC.
1004 O'Reilly Avenue
San Francisco, California 94129
Telephone: (415) 440-6520
Email: daniel@lawyersforcleanwater.com

Jason Flanders
SAN FRANCISCO BAYKEEPER, INC.
785 Market Street, Suite 850
San Francisco, California 94103-2023
Email: jason@baykeeper.org

If to the CITY:

Gregory Newmark
Meyers, Nave, Riback, Silver & Wilson
333 South Grand, Suite 1670
Los Angeles, CA 90071
Telephone: (213) 626-2906
Facsimile: (213) 626-0215
Email: gnewmark@meyersnave.com

City of South San Francisco
400 Grand Avenue
South San Francisco, CA 94080
Telephone: (650) 877-8500
Facsimile: (650) 829-6609
Attn: City Manager

City of South San Francisco
550 N. Canal Street
South San Francisco, CA 94080
Telephone: (650) 877-8550
Facsimile: (650) 877-8665
Attn: Public Works Director

80.     Notices submitted in accordance with this Section shall be deemed submitted on the date they are postmarked or, if sent electronically, they shall be deemed submitted upon transmission, but a notice is not effective if the sending Party learns that it did not reach the Party to be notified. Notwithstanding the sender's receipt of a successful delivery notification, a recipient that fails to receive the submission may request delivery by other means.  Such a request does not affect the timeliness of the original submission.

81.     The City also agrees to provide to Baykeeper any new or existing documents within the City's custody or control that are reasonably necessary to evaluate City Collection System performance and/or compliance with this Consent Decree within thirty (30) days of written request by Baykeeper.

82.     During the life of this Consent Decree, the City shall preserve at least one legible copy of all records and documents, including computer-stored information, which memorialize performance of its obligations under this Consent Decree.

## XXVIII.  GENERAL PROVISIONS

83.     <u>Continuing Jurisdiction</u>.  The Parties stipulate that the District Court shall retain jurisdiction to enforce the terms and conditions of this Consent Decree and to resolve disputes arising hereunder as may be necessary or appropriate for the construction or execution of this Consent Decree up to and including the Termination Date in Part VI.

84.     <u>Construction</u>.  The language in all parts of this Consent Decree shall be construed according to its plain and ordinary meaning, except as to those terms defined in Part II above.

85.     <u>Choice of Law</u>.  The laws of the United States shall govern this Consent Decree.

/ / /

86.   <u>Counterparts</u>.  This Consent Decree may be executed in any number of counterparts, all of which together shall constitute one original document.  Telecopy, scanned copies (i.e., pdf) and/or facsimile copies of original signature shall be deemed to be originally executed counterparts of this Consent Decree.

87.   <u>Modification of the Consent Decree</u>.  This Consent Decree, and any provisions herein, may not be changed, waived, discharged, or terminated unless by a written instrument, signed by the Parties.

88.   <u>Full Settlement</u>.  This Consent Decree constitutes a full and final settlement of this matter.

89.   <u>Integration Clause</u>.  This is an integrated Consent Decree.  This Consent Decree is intended to be a full and complete statement of the terms of the agreement between the Parties and expressly supersedes any and all prior oral or written agreements, covenants, representations, and warranties (express or implied) concerning the subject matter of this Consent Decree.

90.   <u>Authority</u>.  The undersigned representatives for Baykeeper and the City each certify that he/she is fully authorized by the settling Party whom he/she represents to enter into the terms and conditions of this Consent Decree.

The Parties hereby enter into this Consent Decree.

CITY OF SOUTH SAN FRANCISCO


Date: _____      _____

                By:   Barry M. Nagel, City Manager


SAN FRANCISCO BAYKEEPER


Date: <u>March 5, 2011</u>         

             By: Jason Flanders, Staff Attorney

APPROVED AS TO FORM:

For DEFENDANT SOUTH SAN FRANCISCO

Date: _____

By: Gregory Newmark

For SAN FRANCISCO BAYKEEPER:
ENVIRONMENTAL ADVOCATES

*Christopher A. Sproul*

Date: March 5, 2011

By: Christopher Sproul

1579760.4

86.   <u>Counterparts</u>.  This Consent Decree may be executed in any number of counterparts, all of which together shall constitute one original document.  Telecopy, scanned copies (i.e., pdf) and/or facsimile copies of original signature shall be deemed to be originally executed counterparts of this Consent Decree.

87.   <u>Modification of the Consent Decree</u>.  This Consent Decree, and any provisions herein, may not be changed, waived, discharged, or terminated unless by a written instrument, signed by the Parties.

88.   <u>Full Settlement</u>.  This Consent Decree constitutes a full and final settlement of this matter.

89.   <u>Integration Clause</u>.  This is an integrated Consent Decree.  This Consent Decree is intended to be a full and complete statement of the terms of the agreement between the Parties and expressly supersedes any and all prior oral or written agreements, covenants, representations, and warranties (express or implied) concerning the subject matter of this Consent Decree.

90.   <u>Authority</u>.  The undersigned representatives for Baykeeper and the City each certify that he/she is fully authorized by the settling Party whom he/she represents to enter into the terms and conditions of this Consent Decree.

The Parties hereby enter into this Consent Decree.

CITY OF SOUTH SAN FRANCISCO

Date: ___March 9, 2011___        By: Barry M. Nagel, City Manager

SAN FRANCISCO BAYKEEPER

Date: March 5, 2011        By: Jason Flanders, Staff Attorney

1   APPROVED AS TO FORM:        For DEFENDANT SOUTH SAN FRANCISCO

2

3   Date: March 15, 2011

4                        By: Gregory Newmark

5

6                        For SAN FRANCISCO BAYKEEPER: ENVIRONMENTAL ADVOCATES

7

8   Date: March 5, 2011

9                        By: Christopher Sproul

10  1579760.4

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

The City shall fund a Sewer Lateral Replacement Grant Program ("Program") in the amount of $300,000.  The Program will provide grants to eligible homeowners to replace defective sewer laterals in the amount of 50% of the cost of replacement up to a maximum of $2500 per sewer lateral.  Funds will be available on a first-come, first-served basis.  The City shall advertise the Program to the public and shall notify property owners who are required to inspect their private laterals of the availability of grant funds for lateral replacement.

Interested homeowners must hire an independent contractor to conduct a closed-circuit television ("CCTV") inspection of their sewer lateral, which must be observed by City personnel.  If City personnel determines that the sewer lateral is defective based on the CCTV inspection results, the homeowner may submit a grant application to the City.  The grant application must be accompanied by three (3) bids from licensed contractors.  If the application is approved, the homeowner must complete the work within 90 days. Upon completion of the work, the sewer lateral must be tested/inspected by City personnel.  The homeowner must then submit a copy of the paid-in-full invoice for the work performed by the contractor.

**IT IS SO ORDERED.**

Dated: _____MAY 13___, 2011

_Saundra B Armstrong_
The Honorable Saundra B. Armstrong
United States District Court Judge